FILED
U.S. DISTRICT COURT
2012 MAR 30 AM 10:52
CLERK
SO. DIST. OF GA.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
STATESBORO DIVISION

JASON ROBERT RIPPY,

    Plaintiff,

v.                                      CIVIL ACTION NO.: CV611-018

Dr. MARY ALSTON,

    Defendant.

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff Jason Robert Rippy ("Plaintiff"), an inmate currently incarcerated at Johnson State Prison in Wrightsville, Georgia, filed a cause of action pursuant to 42 U.S.C. § 1983 contesting certain conditions of his confinement at Rogers State Prison in Reidsville, Georgia. Defendant Dr. Mary Alston ("Defendant") filed a Motion for Summary Judgment. Plaintiff mailed a document titled "Judgment" to counsel for Defendant. This document, which has not been separately docketed, has been construed by Defendant and the Court as a response in opposition to Defendant's Motion for Summary Judgment. Defendant filed a Reply, to which she attached the Plaintiff's "response in opposition to Defendant's Motion for Summary Judgment." For the reasons which follow, Defendant's Motion should be **GRANTED**.

AO 72A
(Rev. 8/82)

## STATEMENT OF THE CASE[1]

While housed at Coastal State Prison in Garden City, Georgia, Plaintiff was prescribed Neurontin for pain in his back, neck, and shoulders. (Doc. No. 24-1, pp. 3–4). Plaintiff fully admits that Neurontin is primarily used to control seizures. (Doc. No. 27-1, p. 4).

Shortly after being transferred to Rogers State Prison, Plaintiff was seen by a nurse practitioner due to his reporting dizzy spells and a ringing in his ears. (Doc. No. 24-1, p. 4). At that time Plaintiff's medications included Depakote, Propranolol, Remeron, Prozac, Benadryl, Excedrin, and Neurontin; all medications were continued following his visit with the nurse practitioner. (Doc. No. 24-1, pp. 4–5).

In June and July 2010, Defendant saw Plaintiff multiple times following an altercation with several other inmates. (Doc. No. 24-1, p. 5). On July 28, 2010, Defendant requested a neurological consultation for Plaintiff due to a concussion sustained in the altercation. (Doc. No. 24-1, pp. 5, 7).

On August 10, 2010, about five months after Plaintiff arrived at Rogers State Prison, Defendant saw Plaintiff for complaints of back, neck, and shoulder pain. (Doc. No. 24-1, p. 6). Defendant diagnosed Plaintiff with muscle spasms and discontinued his Neurontin, noting that other medications were available which were suitable for pain relief. (Id.). Defendant discontinued Plaintiff's Neurontin prescription because Neurontin is primarily used for seizures, not pain, and it was, therefore, not indicated for Plaintiff's condition. (Id.). Over the course of approximately the next month, Defendant saw Plaintiff three more times as a result of Plaintiff's complaints of back, neck, and

---

[1] The following recitation of facts comes from Defendant's Statement of Material Facts, which Plaintiff has not disputed.

2

shoulder pain; Defendant once gave Plaintiff an injection to Totadal to ease his pain and prescribed him Robaxin, a muscle relaxant. (Doc. No. 24-1, pp. 6–7).

On October 6, 2010, Plaintiff was seen by Dr. Mendoza via telemedicine as a result of Defendant's July 28, 2010, request for neurological consultation. (Doc. No. 24-1, p. 7). Dr. Mendoza recommended a baseline MRI and EEG for Plaintiff. (Id.). Both the MRI and EEG were normal, with the exception of an insignificant sinus disease detected by the MRI. (Doc. No. 24-1, p. 8).

On November 16, 2010,[2] Defendant ordered an orthopedic consult for Plaintiff due to his complaints of chronic neck and shoulder pain. (Id.). On January 26, 2011, Dr. Chutkan, the consulting orthopedist, ordered X-rays of Plaintiff's cervical spine and left shoulder; the results were normal. (Id.). Dr. Chutkan recommended an MRI of Plaintiff's shoulder and physical therapy for Plaintiff's lower back. (Id.). On February 1, 2011, Defendant saw Plaintiff and explained to him that, although Dr. Chutkan had recommended an MRI, there was no medical basis for an MRI because Plaintiff's evaluation and X-rays were normal. (Doc. No. 24-1, p. 9). On February 8, 2011, Defendant ordered the physical therapy recommended by Dr. Chutkan. (Id.).

On March 9, 2011, Defendant again saw Plaintiff for complaints of back and neck pain. (Id.). She again determined that Plaintiff had possible muscle spasms and prescribed Indocin, an anti-inflammatory, for pain. (Id.).

On March 30, 2011, Plaintiff again saw Dr. Mendoza, the neurologist, via telemedicine, to review the result of the MRI and EEG. (Id.). Dr. Mendoza recommended considering discontinuing Depakote and resuming Neurontin for Plaintiff.

---

[2] The record shows the relevant date as November 16, 2011, but this is inconsistent with the timeline provided and is considered by the Court to be a scriveners error.

AO 72A
(Rev. 8/82)

(Doc. No. 24-1, pp. 9–10). Because Plaintiff had been stable on Depakote, Defendant decided there was no reason to change Plaintiff's medication, so she did not do so. (Doc. No. 24-1, p. 10). Depakote served a dual treatment for mental health and managing chronic pain. (Id.). While under Defendant's care, there was never a time when Plaintiff was not prescribed some sort of pain medication. (Doc. No. 24-1, p. 11).

In his Complaint, Plaintiff alleges that he was seen by an orthopedic specialist named Dr. Risenburg who recommended that Plaintiff "have [an] M.R.I. done on [his] neck and to increase [his] pain medication." (Doc. No. 1, pp. 5–6). Plaintiff alleges that Defendant "completely disregaurded [sic] Dr. Risenburg's recommendation to send [him] for [an] M.R.I., and to increase [his] pain medication forcing [him] to have to live in pain." (Id.). Plaintiff does not dispute Defendant's assertions that the orthopedist's name is Dr. Chutkan and that it was Dr. Mendoza who recommended a change in Plaintiff's medication. Plaintiff seeks compensatory damages for pain and suffering. Additionally Plaintiff seeks three forms of injunctive relief: (1) further evaluation with an MRI; (2) to be placed back on Neurontin; and (3) to not be treated by Defendant anymore.

Defendant contends that she did not violate Plaintiff's Eighth Amendment rights. Defendant also contends that Plaintiff cannot pursue claims for money damages against her in her official capacity and that she is entitled to qualified immunity in her individual capacity. Finally, Defendant contends that Plaintiff is not entitled to injunctive relief.

In response, Plaintiff asserts that Defendant's Motion for Summary Judgment should not be granted for three reasons. First, Plaintiff wants a trial so that he can call Drs. Awe, Fogam, and Broom as expert witnesses "to testify as to the course of action

4

AO 72A
(Rev. 8/82)

they took before they decided to put [Plaintiff] on Neurontin" and so that he can put forth his complete medical file as an exhibit. (Doc. No. 27-1, p. 3). Second, Plaintiff discusses grievances that he wrote to Thomas King and the responses he received. Plaintiff does not explain how the grievances contribute to his position that summary judgment should not be granted. Third, Plaintiff states that "according to the Mosly's [sic] Nursing Drug Reference Book [Neurontin] is primarily used for seizure. It also has several unlabeled uses, one being neuropathic pain." (Doc. No. 27-1, p. 4). Plaintiff then re-alleges that Defendant disregarded the recommendation of Dr. Mendoza, a specialist, in that Defendant did not resume Plaintiff's Neurontin prescription. Additionally, Plaintiff states that as soon as he was transferred to Johnson State Prison the doctor there put him back on Neurontin.

## STANDARD OF REVIEW

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. However, there must exist a conflict in substantial evidence to pose a jury question." Hall v. Sunjoy Indus. Grp., Inc., 764 F. Supp. 2d 1297, 1301 (M.D. Fla. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) and Verbraeken v. Westinghouse Elec. Corp., 881 F.2d 1041, 1045 (11th Cir. 1989)).

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that she is entitled to judgment as a matter of law.

5

See Williamson Oil Co., Inc. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003). Specifically, the moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law." Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011) (quoting FED. R. CIV. P. 56(a)). When the nonmoving party would have the burden of proof at trial, the moving party may discharge her burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial. See id. (citing Celotex v. Catrett, 477 U.S. 317, 322–23 (1986)). In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party. Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cnty., Fla., 630 F.3d 1346, 1353 (11th Cir. 2011).

## DISCUSSION AND CITATION TO AUTHORITY

The Eighth Amendment's prohibition against the use of cruel and unusual punishment imposes a constitutional duty upon prison officials to "take reasonable measures to guarantee the safety of the inmates." Farmer v. Brennan, 511 U.S. 825, 832 (1994) (citation omitted). "[D]eliberate indifference to serious medical needs of prisoners" results in a violation of that duty. Id. at 835 (citation omitted). Deliberate indifference "requires more than ordinary lack of due care for the prisoner's interests or safety." Id. (internal punctuation and citation omitted). Importantly, with regard to a prison official's state of mind, a subjective standard is used, requiring the prison official to know of and disregard an excessive risk to inmate health or safety. Id. at 837. "[N]ot every claim by a prisoner that he has not received adequate medical treatment states a

6

AO 72A
(Rev. 8/82)

violation of the Eighth Amendment." Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991) (internal punctuation and citation omitted).

In order to prove a deliberate indifference claim, a prisoner must overcome three obstacles. The prisoner must: (1) "satisfy the objective component by showing that [he] had a serious medical need"; (2) "satisfy the subjective component by showing that the prison official acted with deliberate indifference to [his] serious medical need"; and (3) "show that the injury was caused by the defendant's wrongful conduct." Goebert v. Lee Cnty., 510 F.3d 1312, 1326 (11th Cir. 2007). A medical need is serious if it "has been diagnosed by a physician as mandating treatment or [is] one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Id. (citation omitted). With regard to the second prong, the Court of Appeals for the Eleventh Circuit applies the Farmer standard "requiring that a defendant know of and disregard an excessive risk to an inmate's health or safety." Haney v. City of Cumming, 69 F.3d 1098, 1102 (11th Cir. 1995) (citations omitted). To show a violation of the Farmer standard, an inmate "must prove three things: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." Goebert, 510 F.3d at 1327 (alteration in original) (citation omitted).

Defendant contends that Plaintiff cannot prove that he had a serious medical need. Defendant also asserts that she did not disregard a known risk of serious harm to Plaintiff. Assuming, without deciding, that Plaintiff could show a serious medical need, Plaintiff has not shown that there is a genuine dispute as to any material fact regarding whether Defendant disregarded a known risk of harm to Plaintiff.

7

Plaintiff was housed at Rogers State Prison from March 9, 2010, to August 4, 2011. (Doc. No. 24-1, pp. 4, 11). Defendant first saw Plaintiff on June 21, 2010, following an altercation between Plaintiff and other inmates wherein Plaintiff suffered small cuts and bruises and a mild, stable concussion. (Doc. No. 24-1, p. 5). Defendant saw Plaintiff three additional times, June 23, June 28, and July 28, in relation to that incident. (Id.). On July 28, 2010, Defendant requested a neurological consultation for Plaintiff due to his concussion. (Doc. No. 24-1, p. 7). Plaintiff was seen by Dr. Mendoza, who recommended a baseline MRI and EEG, on October 6, 2010.[3] (Id.). Plaintiff's MRI occurred on November 1, 2010, and his EEG occurred on November 8, 2010; both were normal, with the exception of an insignificant sinus disease detected by the MRI. (Doc. No. 24-1, p. 8). Dr. Mendoza saw Plaintiff on March 30, 2011, to review the results of the MRI and EEG. (Doc. No. 24-1, p. 9). Dr. Mendoza recommended considering discontinuing Plaintiff's Depakote prescription and resuming Plaintiff's use of Neurontin. (Doc. No. 24-1, p. 10). Defendant did not change Plaintiff's medication. (Id.).

On August 10, 2010, Defendant first saw Plaintiff for complaints of back, neck, and shoulder pain. (Doc. No. 24-1, p. 6). During that visit, Defendant diagnosed Plaintiff with muscle spasms and discontinued his Neurontin prescription, noting that other medications were available which were suitable for pain relief. (Id.). Plaintiff admits that Neurontin is primarily a seizure medication and that he was taking it for back pain, not seizures. (Doc. Nos. 27-1, p. 4 and 24-4, p. 77). Over the course of the next year, Defendant saw Plaintiff at least ten additional times in relation to Plaintiff's

---

[3] In the interim, Defendant saw Plaintiff for complaints of back, neck, and shoulder pain and discontinued Plaintiff's Neurontin prescription, as discussed below.

8

complaints of back, neck, and shoulder pain. (Doc. No. 24-1, pp. 6–11). As treatment for Plaintiff's pain, Defendant twice requested a physical therapy evaluation, which ultimately resulted in some physical therapy for Plaintiff. (Doc. No. 24-1, pp. 6–7, 9). As additional treatment, Defendant once gave Plaintiff an injection of Totadal and continually gave Plaintiff a prescription for either a muscle relaxant called Robaxin[4] or an anti-inflammatory called Indocin. (Doc. No. 24-1, pp. 6–10). Plaintiff was taking Depakote, which served a dual treatment for mental health and managing chronic pain, the entire time he was under Defendant's care. (Doc. No. 24-1, pp. 4–10). As additional treatment, Defendant ordered a back brace for Plaintiff. (Doc. No. 24-1, p. 10). On November 16, 2010, Defendant ordered an orthopedic consult due to Plaintiff's complaints of chronic pain. (Doc. No. 24-1, p. 8). The consulting orthopedist, Dr. Chutkan, requested X-rays of Plaintiff's cervical spine and left shoulder on January 26, 2011; the results were normal, yet Dr. Chutkan recommended physical therapy for Plaintiff's lower back pain and an MRI of Plaintiff's shoulder. (Id.). Defendant ordered the physical therapy consult that Dr. Chutkan recommended, but she did not proceed with an MRI. (Doc. No. 24-1, p. 9).

Plaintiff's case is premised upon two allegations: (1) Defendant disregarded Dr. Mendoza's recommendation that Plaintiff's Neurontin prescription be resumed, and (2) Defendant disregarded Dr. Chutkan's recommendation that an MRI be performed on Plaintiff's shoulder. Defendant admits that she did not follow these specific recommendations of Drs. Mendoza and Chutkan. However, Defendant states in her Affidavit that she "discontinued the Neurontin for [Plaintiff] because Neurontin is

---

[4] At some point, Plaintiff's prescription was for methocarbonal, the generic form of Robaxin. (Doc. No. 24-1, p. 8).

primarily used for seizures, not pain, thus it was not indicated for [Plaintiff's] condition. He was still on the Excedrin for pain, as well as the mental health medications which also are used to manage chronic pain." (Doc. No. 24-4, p. 16, Def.'s Aff., p. 8). Additionally, Defendant states that "[t]he recommendation to change back to Neurontin was simply a recommendation and since [Plaintiff] had been stable on Depakote [she] saw no reason to change his medication. The Depakote served a dual treatment for mental health as well as managing chronic pain." (Doc. No. 24-4, pp. 21–22, Def.'s Aff., pp. 13–14). Defendant also states that "although the orthopedist recommended an MRI, there was no medical basis to proceed with one because [Plaintiff's] evaluation and x-rays were normal, and the physical examination of [Plaintiff] did not support further diagnostic testing." (Doc. No. 24-4, p. 20, Def.'s Aff., p. 12). Plaintiff offers nothing to dispute Defendant's medical bases for her decisions.[5]

"[A] 'simple difference in medical opinion' is not deliberate indifference." Simpson v. Holder, 200 F. App'x 836, 839 (11th Cir. 2006) (quoting Waldrop v. Evans, 971 F.2d 1030, 1033 (11th Cir. 1989)). A claim that an inmate did not receive the medical attention he deemed appropriate is legally insufficient to sustain a cause of action for deliberate indifference to serious medical needs. See Harris, 941 F.2d at 1505 (noting that a mere difference of opinion as to a prisoner's diagnosis or course of treatment does not support a claim under the Eighth Amendment). That Defendant decided to not follow the recommendations of Drs. Mendoza and Chutkan is not a sufficient basis to

---

[5] Plaintiff states that he could present Drs. Awe, Fogam, and Broom as experts "to testify as to the course of action they took before they decided to put [Plaintiff] on Neurontin[.]" (Doc. No. 27-1, p. 3). However, evidence relating to the conduct of these doctors will not result in the creation of a genuine dispute as to any material fact regarding whether Defendant disregarded a known risk of serious harm to Plaintiff. That Defendant decided upon a different course of treatment for Plaintiff does not result in a finding of deliberate indifference.

10

find that she was deliberately indifferent to Plaintiff's medical needs. Plaintiff has not presented evidence that creates a genuine dispute as to any material fact regarding whether Defendant disregarded a known risk of serious harm to Plaintiff. As a result, no constitutional violation has been shown, and summary judgment in favor of Defendant is appropriate.

Defendant's remaining arguments in support of her Motion for Summary Judgment do not need to be addressed in depth. Defendant correctly asserts that Plaintiff cannot pursue claims for money damages against her in her official capacity because, in her official capacity, she is not a person within the meaning of § 1983. Howell v. City of Lithonia, 397 F. App'x 618, 621 n.2 (11th Cir. 2010) (citing Will v. Mich. Dep't of State Police, 491 U.S. 58 (1989)). Defendant asserts that in her individual capacity she is entitled to qualified immunity. Because summary judgment is appropriate based on Plaintiff's failure to create a genuine dispute as to an essential element of his deliberate indifference claim, a qualified immunity defense is not necessary. Martinez v. Burns, 2012 WL 653873 (11th Cir. March 1, 2012) (citing Carter v. Galloway, 352 F.3d 1346, 1350 n.10 (11th Cir. 2003)). Finally, Defendant correctly asserts that Plaintiff is not entitled to injunctive relief because he has not created a genuine dispute regarding whether any of his constitutional rights have been violated. See 18 U.S.C. § 3626(a)(1).

AO 72A
(Rev. 8/82)

## CONCLUSION

Based on the foregoing, it is my **RECOMMENDATION** that Defendant's Motion for Summary Judgment be **GRANTED** and that Plaintiff's Complaint be **DISMISSED**.

**SO REPORTED** and **RECOMMENDED**, this 30th day of March, 2012.

JAMES E. GRAHAM
UNITED STATES MAGISTRATE JUDGE